UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| VITALIY JACOB BRATNICHENKO | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:18-cv-30110-KAR |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

<u>MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR ORDER
REVERSING THE COMMISSIONER'S DECISION AND DEFENDANT'S MOTION FOR
ORDER AFFIRMING THE DECISION OF THE COMMISSIONER</u>
(Docket Nos. 16 & 21)

ROBERTSON, U.S.M.J.

I.     INTRODUCTION AND PROCEDURAL HISTORY

Vitaliy Jacob Bratnichenko ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g)

seeking review of a final decision of the Acting Commissioner of Social Security

("Commissioner") denying his application for Social Security Disability Insurance Benefits

("DIB").  Plaintiff applied for DIB on June 10, 2015, alleging an onset date of April 3, 2014,

later amended to July 3, 2014 (Administrative Record ("AR") 443, Dkt. No. 15).  Plaintiff

claimed disability due to Complex Regional Pain Syndrome/Reflex Sympathetic Dystrophy

Syndrome ("CRPS" or "RSDS"),[1] which originated in a work injury (AR 335).  His application

was denied initially and on reconsideration (AR 116-17, 138-39, 158-60, 182).  On February 25,

---

[1] CRPS and RSDS are synonymous terms, Social Security Ruling 03-2p ("SSR 03-2p"), 2003
WL 22399117 (Oct. 20, 2003), and Plaintiff's medical records use both.  For the sake of
simplicity, the court will refer herein solely to CRPS.

2016, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), and one was held on June 23, 2017 (AR 58-105).  On August 30, 2017, the ALJ issued an unfavorable decision (AR 11-24).  Plaintiff sought review by the Appeals Council, which denied relief (AR 1-7).  Thus, the ALJ's decision became the final decision of the Commissioner, and this suit followed.

Plaintiff appeals from the ALJ's decision on the grounds that (1) the ALJ's decision is not supported by substantial evidence in that the ALJ failed to accord controlling weight to the opinions of Plaintiff's treating care provider, a pain specialist; and (2) the Appeals Council erred by refusing to consider additional evidence (Dkt. No. 17 at 18).  Pending before this court are Plaintiff's motion for an order reversing the Commissioner's decision (Dkt. No. 16) and Defendant's motion for an order affirming the Commissioner's decision (Dkt. No. 21).  The parties have consented to this court's jurisdiction (Dkt. No. 13).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the reasons stated below, the court will allow Plaintiff's motion for an order reversing the Commissioner's decision and deny the Commissioner's motion.

II.    LEGAL STANDARDS

A.    Standard for Entitlement to Disability Insurance Benefits

In order to qualify for DIB, a claimant must demonstrate that he is disabled within the meaning of the Social Security Act.[2]  A claimant is disabled for purposes of DIB if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §

---

[2] There is no challenge to Plaintiff's insured status for purposes of entitlement to DIB.  *See* 42 U.S.C. § 423(a)(1)(A).

423(d)(1)(A).  A claimant is unable to engage in any substantial gainful activity when he is not only

> unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).  The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated by the Social Security Administration.  *See* 20 C.F.R. § 404.1520(a)(4)(i-v).  The hearing officer must determine:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience.  *See id; see also Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process).  If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step.  20 C.F.R. § 404.1520(a)(4).

Before proceeding to steps four and five, the Commissioner must make an assessment of the claimant's residual functional capacity ("RFC"), which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work.  *See id.*

> RFC is what an individual can still do despite his or her limitations.  RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may

> cause physical or mental limitations or restrictions that may affect his or her
> capacity to do work-related physical and mental activities.

Social Security Ruling 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, including the

burden to demonstrate RFC. *Flaherty v. Astrue*, Civil Action No. 11-11156-TSH, 2013 WL

4784419, at *8-9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th

Cir. 2004)). At step five, the Commissioner has the burden of showing the existence of jobs in

the national economy that the claimant can perform notwithstanding his or her restrictions and

limitations. *Goodermote*, 690 F.2d at 7.

B.     Standard of Review

The district court may enter a judgment affirming, modifying, or reversing the final

decision of the Commissioner, with or without remanding for rehearing. *See* 42 U.S.C. § 405(g).

Judicial review "is limited to determining whether the ALJ used the proper legal standards and

found facts upon the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652,

655 (1st Cir. 2000). The court reviews questions of law *de novo*, but "the ALJ's findings shall

be conclusive if they are supported by substantial evidence, and must be upheld 'if a reasonable

mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his

conclusion,' even if the record could also justify a different conclusion." *Applebee v. Berryhill*,

744 F. App'x 6, 6 (1st Cir. 2018) (mem.) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*,

647 F.2d 218, 222-23 (1st Cir. 1981) (citations omitted)). "Substantial-evidence review is more

deferential than it might sound to the lay ear: though certainly 'more than a scintilla' of evidence

is required to meet the benchmark, a preponderance of evidence is not." *Purdy v. Berryhill*, 887

F.3d 7, 13 (1st Cir. 2018) (quoting *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51,

56 (1st Cir. 2003)). In applying the substantial evidence standard, the court must be mindful that

it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve

conflicts in the evidence, and draw conclusions from such evidence. *See Applebee,* 744 F. App'x

at 6. "Under the substantial-evidence standard, a court looks to an existing administrative record

and asks whether it contains 'sufficien[t] evidence' to support the agency's factual

determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). That said, the ALJ may not

ignore evidence, misapply the law, or judge matters entrusted to experts. *Nguyen v. Chater*, 172

F.3d 31, 35 (1st Cir. 1999) (per curiam).

When, as in this case, the ALJ reaches step five in the sequential evaluation process, the

burden shifts to the Commissioner to show that the claimant can perform work other than his

past relevant work. *Vallier v. Berryhill*, No. 1:17-cv-00064-DBH, 2017 WL 5665539, at *2 (D.

Me. Nov. 26, 2017), *adopted by* 2017 WL 6347776 (D. Me. Dec. 12, 2017). "The record must

contain substantial evidence in support of the commissioner's findings regarding the plaintiff's

RFC to perform such other work." *Id.* "A hearing officer, as a lay person, generally is not

qualified to interpret raw medical data to determine a claimant's RFC." *Beyene v. Astrue*, 739 F.

Supp. 2d 77, 83 (D. Mass. 2010) (citing *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76

F.3d 15, 17 (1st Cir. 1996)). When a claimant has put his functional capacity sufficiently at issue

by the submission of evidence of a severe impairment, "the hearing officer is obliged to measure

the claimant's relevant capabilities and 'to make that measurement, an expert's RFC evaluation

is ordinarily essential.'" *Id.* (quoting *Santiago v. Sec'y of Health & Human Servs.*, 944 F.2d 1, 7

(1st Cir. 1991)).

III.    <u>FACTS</u>

A.    <u>Plaintiff's Background</u>

Plaintiff was twenty-four years old on the date of the hearing before the ALJ.  He

graduated from high school and college, receiving a bachelor's degree in finance from the

University of Massachusetts in June 2015 (AR 70).  Plaintiff, who is right-hand dominant,

played volleyball and was a body builder (AR 544).  He had worked as a nurse's aide and a

personal care attendant (AR 73-74).  On April 3, 2014, while working as an order picker at a

warehouse, Plaintiff injured his left shoulder when lifting a heavy case (AR 75, 544).  He was

placed on light duty at this job (AR 62), then left and found a position as a personal care

assistant, at which he worked until February 2015 (AR 68).[3]

B.    Medical Records

The court limits its summary to those medical records that appear most relevant to

Plaintiff's claims of error and requested relief.

Plaintiff suffered a work-related injury on April 3, 2014.  The earliest related medical

record is an April 9, 2014 letter from Lori Gomez, D.O., interpreting a scan of Plaintiff's

shoulder, which Dr. Gomez determined showed "normal views of the left shoulder" (AR 589).

When Plaintiff's shoulder remained painful, he sought treatment from Clifford Rios, M.D., of

Orthopedic Associates of Hartford (AR 544-45).  On May 29, 2014, Plaintiff presented with his

left arm in a sling and reported diffuse pain and prominent loss of motion.  He told the doctor

that "[h]e [felt] like he cannot move his arm at all."  On examination, Dr. Rios noted that

Plaintiff's shoulder musculature was "well-developed, without evidence of atrophy," and "no

cutaneous abnormality."  The doctor could only conduct a limited exam because Plaintiff

"refused to straighten his elbow fully because he said this hurt[] his shoulder.  He had a global

---

[3] Plaintiff testified at the hearing that, although he was technically the employee, his mother did
the work as a personal care assistant in 2014-2015 (AR 68-69).

loss of active and passive motion of the shoulder, although [Dr. Rios] could not tell if there was some volitional component to this." Dr. Rios evaluated an MRI that Plaintiff obtained on May 6, 2014, and "saw no evidence of a rotator cuff tear or labral tear" (AR 544). Dr. Rios told Plaintiff that he had a "very unusual presentation for this type of injury." He gave Plaintiff a trial of naproxen, referred him to physical therapy, and recommended "discontinuing the sling and starting to move his shoulder and elbow" (*id.*). Finally, Dr. Rios put Plaintiff on light duty restriction with no lifting of the left arm (AR 454).

From June until August 2014, Plaintiff attended some seven sessions of physical therapy at NovaCare Rehabilitation (AR 831-58). Plaintiff's initial evaluation was on June 9, 2014 (AR 858-864). The intake note lists Plaintiff's diagnosis as shoulder joint pain and adhesive capsulitis in the shoulder. Plaintiff reported that he was unable to bathe, carry things, reach, or perform any chores with his left upper extremity; he dressed himself with difficulty; and he had one to three disturbances in his sleep per week. Plaintiff reported his severity of pain as, at best, a six out of ten and a ten out of ten at worst. Upon objective examination, the physical therapist noted Plaintiff's symptoms were "extremely irritable, to the point where we were unable to move his [upper extremity] much past position of comfort" (AR 858). The therapist further noted that Plaintiff's range of motion was "extremely limited as he [was] virtually unable to move shoulder away from torso" and that Plaintiff also presented with limited range of motion in his elbow, likely due to his use of a sling, which Plaintiff was advised to discontinue (AR 859).

Plaintiff returned to physical therapy on June 13 (AR 855-57), June 18 (AR 852-54), June 23 (AR 844-47), June 27 (AR 840-42), June 30 (AR 837-39), and July 2, 2014 (832-36). Through each session, Plaintiff "remain[ed] extremely irritable with shoulder/elbow/forearm motion. Objective measurements reassessed with minimal change" (AR 848). After Plaintiff's

fourth visit, the physical therapy team contacted Dr. Rios and informed him of Plaintiff's

"continued considerable pain with all motions [and were] [i]nstructed to continue" (AR 845).  As

treatment continued, Plaintiff had "extreme guarding with all motions and [extensions]" and held

his left upper extremity in a "guarded position throughout the entire treatment" (AR 841).

On July 3, 2014, Plaintiff returned to Dr. Rios for a follow up (AR 540-41).  Plaintiff

reported that physical therapy made him feel worse and that he could not use his arm at all.  On

examination, Dr. Rios noted that Plaintiff maintained well-developed musculature around the

arm and forearm, that the temperature of his hands was grossly symmetric, and that there was no

asymmetry in perspiration or color.  In assessing Plaintiff's range of motion, the doctor noted

some limitations, but could not tell "if there [was] a volitional component to this" (AR 540).  Dr.

Rios gave a diagnostic impression of possible CRPS of the left arm.  He recommended that

Plaintiff see a specialist in CRPS.

Plaintiff returned to Dr. Rios on August 15, 2014, with continued complaints of constant

discomfort in his left arm that now prevented him from sleeping, as well as with reports that he

still could not use his arm at all (AR 537-39).  Though Plaintiff's range of motion was still

globally limited, his "muscular development show[ed] no gross evidence of atrophy" (AR 537).

Dr. Rios had consulted with Raymond Squire, M.D., who did not feel that Plaintiff's symptoms

were consistent with CRPS.  Dr. Rios listed Plaintiff's diagnosis as left shoulder adhesive

capsulitis, though the doctor noted that this did not explain Plaintiff's loss of elbow motion.  The

doctor further recommended that Plaintiff try a diagnostic corticosteroid injection into the intra-

articular space of the left shoulder.  Dr. Rios remarked, "Consideration for examination under

anesthesia may be warranted, although this degree of limitation seems more than I would expect

from his MRI findings and reported injury.  Moreover, his maintenance of well-developed

musculature in spite of not being able to 'move [his] arm' for 4 months seems to be contradicted" (AR 537).  Plaintiff received a note authorizing his return to work with no restrictions that day (AR 539).  On September 15, 2014, Plaintiff reported to Ilham Bothner, RNCS, NPC, who completed a worker's compensation exam concerning Plaintiff's "extreme pain" in the left arm and shoulder and the upcoming cortisone injection (AR 673-74).

On October 14, 2014, Plaintiff saw Dr. Rios again, reporting persistent, constant pain in his left shoulder, elbow, and forearm (AR 535-36).  Plaintiff stated that the corticosteroid injection did not help at all; in fact, Plaintiff felt it made the pain worse and made it harder for him to move his elbow and wrist (AR 535, 748).[4]  When the doctor examined Plaintiff, he had tenderness to light touch over the majority of his left upper extremity and his motion was "limited in all planes secondary to pain" (AR 535).  Dr. Rios noted that the temperature and color of Plaintiff's hands remained symmetric.  Dr. Rios concluded that there was no specific orthopedic diagnosis that would explain Plaintiff's symptomology and recommended another consultation with Dr. Squire for evaluation for CRPS.

On January 14, 2015, Plaintiff saw Howard Lantner, M.D., at Minimally Invasive Spine and Neurosurgery in Connecticut for treatment of left shoulder pain (AR 554).  Plaintiff reported that he had "pain, numbness and tingling radiating to the left chest and left upper extremity" and that his symptoms significantly worsened after an injection in his left shoulder (AR 554).  He had stopped taking pain medication because he ran out of it.  Plaintiff had "noticed some imbalance and also some memory and concentration issues."  Dr. Lantner could not examine

---

[4]  The administrative record does not appear to contain treatment notes or other documentation concerning the October 3, 2014 left glenohumeral joint injection, although several medical providers remarked on the procedure and that Plaintiff's symptoms worsened after the injection (AR 669, 748).

Plaintiff's left upper extremity or shoulder due to Plaintiff's discomfort; "[a]ny movement of that left arm worsens his left upper extremity pain." Dr. Lantner assessed Plaintiff as having left shoulder and upper extremity pain "likely secondary to [CRPS]" (AR 554). The doctor recommended that Plaintiff continue with his pain management visits. Dr. Lantner opined that "[b]ased on the history obtained, [Plaintiff's] current symptoms are related to the on the job injury of April 3, 2014" (AR 555).

On April 29, 2015, Plaintiff had an appointment at Baystate Health Pain Management Center with Ashish Malik, M.D. (AR 556-64). In reporting his history, Plaintiff stated that while gabapentin and ibuprofen helped relieve the pain a bit, naproxen did not help. Physical therapy did not help and steroid injections worsened the condition (AR 558). Dr. Malik noted that initially Plaintiff's shoulder MRI had been read to show a tear, but a second opinion found that there was no tear. Upon examination, Dr. Malik found several differences between Plaintiff's left and right upper extremities, such as weaker peripheral pulse, paler skin, and poor capillary refill in the left hand. He also noted that the left hand was sweating. The doctor noted that there was no muscular atrophy appreciated between the upper extremities. Dr. Malik diagnosed Plaintiff with CRPS, noting that he had swelling, sweating, color change, and allodynia.[5] He formulated a treatment plan that included a nerve block so Plaintiff could better tolerate physical therapy (AR 560).

On May 5, 2015, Plaintiff saw Matthew Hellman, M.D., of Pain Management at Beth Israel Deaconess Medical Center for a second opinion on receiving a stellate ganglion block given that his pain worsened after the steroid injection (AR 568-69). Dr. Hellman recommended

---

[5] Allodynia is "[t]he distress resulting from painful stimuli." Stedman's Medical Dictionary 47 (25th ed. 1990).

increasing his gabapentin dosage and returning to physical therapy (AR 569).  On May 19, 2015,

Plaintiff returned to Dr. Hellman for a follow up.  Dr. Hellman noted that Plaintiff had not

followed up on his prior recommendations of a higher dosage of gabapentin, physical therapy,

and seeing a neurologist (AR 572).  Plaintiff continued to describe the pain as a ten out of ten

burning sensation that originated in his shoulder and shot down his arm to all five fingers.  Dr.

Hellman prescribed the same course of treatment as he had at the earlier visit.

On May 23, 2015, Kim Paul, PT, evaluated Plaintiff at Attain Therapy and Fitness to

begin a course of physical therapy (AR 576-81). The assessment indicated that Plaintiff was not

a candidate for skilled physical therapy at the time because he could not tolerate any touch or

movement of his left upper extremity.  The notes remarked on Plaintiff's significant guarding of

his left upper extremity (AR 579), as well as the fact that he had not begun his treatment of

gabapentin, as he was awaiting insurance approval.

On May 26, 2015, Julie L'Heureux, FNP, saw Plaintiff at Pioneer Spine and Sports

Physicians.  While she noted that Plaintiff appeared healthy and well developed and exhibited no

apparent signs of distress, the nurse practitioner noted that Plaintiff had an extreme limitation in

the range of motion of his left shoulder because of pain and that, as compared to his right arm,

Plaintiff's left arm was weaker, cooler, exhibited hair loss and showed mottled skin (AR 584).

The nurse practitioner assessed Plaintiff's presentation as clinically consistent with left upper

arm pain secondary to CRPS (AR 585).

On June 10, 2015, Plaintiff was referred to Jerrold Kaplan, M.D., for a commissioner's

examination related to his worker's compensation claim (AR 671).  After Dr. Kaplan conducted

the July 9, 2015 evaluation, Plaintiff requested the Dr. Kaplan take over as treating physician so

that Plaintiff could begin to implement treatment recommendations (AR 668).  Dr. Kaplan

ordered physical therapy and added to or adjusted Plaintiff's medications.  Plaintiff also reported new pain in his right shoulder.  Dr. Kaplan determined that if those symptoms did not clear up, he would order an additional work-up on Plaintiff's right shoulder.

In July 2015, Plaintiff returned to NovaCare Rehabilitation for treatment of his left shoulder (AR 596-618).  He had seven visits over the following two months (July 14, 17, 20, 24, 31 and August 3 and 5, 2015).  The initial examination noted that Plaintiff could not use his left shoulder for carrying, dressing, eating, grasping, gripping, or light housework (AR 596).  Also, Plaintiff woke up at least four times a night due to disturbance from his left shoulder (*id.*).  Later visits noted that Plaintiff had poor tolerance to all treatment in part because he guarded all joints (AR 602).  Treatment of Plaintiff's left upper extremity was "limited by pain and significant limitation in [range of motion] of shoulder, elbow, wrist and fingers," and he was hypersensitive to light touch, which was "more pronounced in [the] upper shoulder region of [left] side" (AR 605).  With effort, the physical therapist was able to get Plaintiff's left hand to "near neutral" finger extension in all digits, but after release the hand returned to a closed position (AR 610).  At the last session, Plaintiff's left upper extremity was "still non functional" (AR 616).

On August 12, 2015, Plaintiff returned to Dr. Kaplan (AR 777).  Dr. Kaplan noted Plaintiff's CRPS in the left upper extremity, as well as compensatory right rotator cuff tendonitis, and commented that Plaintiff had a "very hard time tolerating the [physical therapy]," because Plaintiff was sensitive to cold and the air conditioning at physical therapy "exacerbate[d] his pain."  The physician commented that Plaintiff's "[l]eft upper extremity has ongoing severe allodynia, decreased motion, spasticity and no functional use. Temp in the left hand is 91.6 degrees compared to 93.8 on the right.  The skin on the hand is red, shiny and swollen" (AR

777).  Dr. Kaplan determined that PT should be put on hold and recommended that Plaintiff try sympathetic ganglion blocks.

On August 25, 2015, Plaintiff visited the Hartford Hospital Pain Treatment Center for treatment of his left upper extremity pain and paresthesia (AR 620-22).[6]  He described his pain to nurse practitioner Anton Cherry as "burning, cramping, sharp, shooting, aching, dull, throbbing, constant and intermittent" and said that the pain "increased with walking, standing and activity." Plaintiff further reported that his left upper arm was hypersensitive, turned blue on occasion (worse with exposure to cold) or sometimes went very pale, and that there was "a lot of sweating throughout [the] limb, hand clawing, [and] global reduced [range of motion]" (AR 620).  The nurse noted on examination that Plaintiff's left upper extremity had abnormal reflexes and an abnormal peripheral neuro exam, as well as abnormal skin and subcutaneous tissue in appearance and upon palpitation.  Plaintiff's medical plan included new medications, a stellate block, future consideration of Calmare for CRPS, brachial plexopathy, or laser treatment (AR 622).

On September 9, 2015, Plaintiff underwent a left stellate ganglion block.  The first two attempts to inject the contrast agent were unsuccessful.  The third attempt was successful, and Ricardo Taboada, M.D., then injected an anesthetic drug into the C7 stellate ganglion chain level.  Plaintiff "experienced a slight left-sided lid lag and some slightly increased warmth of the ipsilateral upper extremity," and "some decrease in the allodynia almost immediately" (AR 628).

On September 28, 2015, Plaintiff returned to the Hartford Hospital pain treatment center (AR 624-27).  He reported that the stellate block did not help the pain in his left upper extremity. According to him, his average pain level remained a ten on a scale of one to ten, and he had

---

[6] Paresthesia is "an abnormal sensation, such as of burning, pricking, tickling, or tingling." Stedman's Medical Dictionary 1140 (25th ed. 1990).

disrupted sleep because of pain.  The new and increased pain medications did provide some

relief and helped "partially with maintaining functional level(s)" (AR 624).   Plaintiff's new

medical plan was for laser treatment over several weeks and future consideration of other

treatments (AR 625).

On October 5, 2015, Plaintiff returned to Dr. Kaplan, reporting that the sympathetic

ganglion block "did not help and in fact caused symptoms of increased pain on his right side."

Plaintiff stated that the course of steroids had improved his right shoulder problems, but provided

only a brief respite from some of the numbness on his left side.  Dr. Kaplan noted that Plaintiff's

"severe left upper extremity CRPS [was] not really improving.  He need[ed] additional treatment

to prevent a permanent loss of left upper extremity function" (AR 666).

On November 2, 2015, Svetlana Puzankov, P.A.C., filled out an attending Physician's

Statement for Plaintiff's application for student loan forgiveness based on his condition, which

was also signed by Lance Reynolds, M.D. (AR 893-94).  Dr. Reynolds noted that Plaintiff was

totally disabled, house confined due to sensitivity to temperature, and that he expected Plaintiff's

condition to deteriorate (AR 894).  The doctor further noted that Plaintiff was ambulatory.

On November 9, 2015, Plaintiff again saw Dr. Kaplan.  His symptoms remained

unchanged and his condition had not improved with multiple medications or after the trial of

ganglion blocks.  Dr. Kaplan decided that Plaintiff required more aggressive treatment for "his

severe upper extremity CRPS" (AR 776).  The physician felt the best course of action would be

an IV Ketamine protocol and referred Plaintiff to Pradeep Chopra, M.D., in Rhode Island.

On December 18, 2015, Plaintiff visited Dr. Chopra at the Interventional Pain

Management Center at Brown Medical School (AR 741-53).  Dr. Chopra noted Plaintiff's

symptoms to be diffuse pain to touch extending from his left shoulder to his fingertips; color

changes in that arm that ranged from pale to dark red or blue; warmer temperature on his left upper extremity as compared to his right; little to no range of motion to his left shoulder, elbow, and wrist with spasticity of the fingers; significant swelling and decreased hair growth on his left forearm; and poor sleep due to pain (AR 749).  Plaintiff's motor examination was 5/5 for both lower extremities (AR 750).  Dr. Chopra assessed Plaintiff as having CRPS of the left upper extremity, Thoracic Outlet Syndrome on the left, Postural Orthostatic Tachycardia Syndrome, and severe spasticity of the left upper extremity (AR 751).  The doctor recommended a low dose ketamine intervention, as well as an exercise program, guided imagery, and mirror therapy (AR 752-53).

On December 23, 2015, Plaintiff visited Family Medicine Associates and saw physician's assistant Puzankov for help with his disability paperwork for student loan forgiveness and a handicap placard (AR 889-96).  Plaintiff reported that his left arm was virtually useless, he had experienced no improvement in strength or movement despite treatment, and he desired a handicap placard because "he ha[d] pain with walking distances aggravated in the left arm by the movement" (AR 889).  The progress note mentioned Plaintiff's "left arm muscle weakness and pain from shoulder to fingertips" (AR 890).  The musculoskeletal examination revealed tenderness to touch, pain on motion, decreased strength, and "decreased tone throughout" (AR 891).

On January 26, 2016, Plaintiff returned to Dr. Kaplan for re-evaluation (AR 775).  Dr. Kaplan summarized Plaintiff's visit to Dr. Chopra and endorsed Plaintiff's need to start the ketamine program as soon as possible.  On examination, Dr. Kaplan remarked that the skin on Plaintiff's left hand was red, shiny, and swollen again, though there was no temperature

difference this time.  Plaintiff also saw Dr. Kaplan on February 29, 2016, when the doctor wrote

that Plaintiff was "getting extremely frustrated and depressed by his current situation" (AR 774).

On January 27, 2016, Plaintiff returned to Dr. Chopra for a follow up visit (AR 745-46).

At this visit, Plaintiff's gait was normal, he could walk on his heels and toes, and his motor

examination was normal for both lower extremities (AR 745).  He had extremely limited range

of motion to his left shoulder, elbow, and hand and could not open his left hand from its

extremely tight grip (AR 745-46).  The doctor noted a four-degree temperature difference

between Plaintiff's left and right hands, color asymmetry between the hands, and swelling of

Plaintiff's left forearm.  Dr. Chopra further noted that Plaintiff had significant muscle atrophy to

his left deltoid (AR 746).  The doctor was very concerned about Plaintiff's deteriorating

condition and noted that his condition was "alarmingly severe" (AR 746).

On March 10, 2016, Plaintiff again saw Dr. Chopra, who noted that Plaintiff's condition

was worse, but he had not started any recommended treatment because his insurance had not

approved treatment (AR 742-43).  Plaintiff's neurological and physical examinations were

largely unchanged from the previous appointment, except that the temperature difference

between Plaintiff's hands was now seven degrees and the doctor noticed new atrophying of

Plaintiff's brachioradial muscle.  In the course of the appointment, Dr. Chopra reviewed an

independent medical evaluation (IME) report authored in April 2015 by James Donaldson, M.D.

Dr. Chopra characterized the report as "unacceptable.  Clearly, Dr. Donaldson has no idea of the

gravity of the situation. [Plaintiff] clearly meets [] all the criteria for the above diagnosis [of

CRPS]" (AR 743).  Dr. Chopra opined that without urgent and aggressive treatment, Plaintiff

would lose all function of his left hand and upper extremity.  Plaintiff returned for follow up

visits to Dr. Chopra on April 22 (AR 799-800) and May 26, 2016 (AR 797-98), in preparation

for the IV ketamine treatment.  Dr. Chopra noted greater muscle atrophy of Plaintiff's left upper extremity and continued severe and intractable pain.

On April 25, 2016, Plaintiff brought more disability paperwork to physician's assistant Puzankov.  She wrote:

> Very pleasant 23 year young male presents for completion of disability paperwork.  He has the physical disability related to lack of use of his left arm due to complex regional pain syndrome, with constant pain and weakness which extends to his right arm to a degree, ongoing since a work injury 4/2014.  This has turned into a life altering condition that affects every aspect of his life, with physical disability affecting his ability to do basic things, including work and take care of his own personal needs, not to mention social impact.

(AR 881).  Ms. Puzankov noted that Plaintiff appeared alert and oriented and in no acute distress (AR 882).  Upon examination, Plaintiff's skin was warm and dry with good color and his lower extremities exhibited no edema bilaterally, and no clubbing or cyanosis of digits (AR 883).

In May 2016, Plaintiff had several cardiac studies because he was suffering from infrequent palpitations and a racing sensation in his chest (AR 873-880).  The cardiology consult was requested in advance of the ketamine infusion.  Haris Athar, M.D., who conducted the consultation, remarked in the progress notes that Plaintiff "has been diagnosed by expert pain management specialists with complex regional pain syndrome of the left upper extremity" (AR 877, 879).  The doctor further noted that Plaintiff had been suffering for more than a year.  The cardiac study included a Holter exam (AR 874).  Plaintiff also was given an echocardiogram during which he was "unable to lie on his left side due to shoulder problems" (AR 875).

On July 25, 26, and 28 (AR 791-96), August 1, 2, and 3 (AR 789-91), and September 16, 2016 (AR 786-87), Plaintiff was administered a regimen of low dose intravenous ketamine infusions.  He tolerated the procedures well initially and, after the fifth injection, reported that he experienced mild relief from the pain (AR 789).  In September 2016, however, Plaintiff reported

17

to Dr. Chopra that the ketamine intervention had not provided significant relief (AR 786).  The

last visit to Dr. Chopra in the record was on April 10, 2017 (AR 900-01).  At this appointment,

the doctor noted that Plaintiff continued to have "severe and significant pain," had "almost no

use of his left upper extremity," and had "dystonic contracture to the left fist."  Dr. Chopra

remarked that Plaintiff had lost significant weight and that Plaintiff reported "severe fatigue,

poor memory, and blurry vision" (AR 900).

Plaintiff returned to Dr. Kaplan on August 11, 2016, reporting that the ketamine protocol

had not helped and had given rise to symptoms including weakness, light sensitivity, and balance

problems.  Dr. Kaplan noted that Plaintiff was now experiencing pain and decreased motion in

his right shoulder.  Plaintiff's left upper extremity exhibited "[s]evere allodynia, decreased

motion, dry red skin, no hair growth and no functional use" (AR 773).  Dr. Kaplan recommended

that Plaintiff enter a comprehensive inpatient pain management rehabilitation program.

C.    Opinion Evidence

Plaintiff was referred to Dr. Donaldson for an IME, conducted on March 30, 2015 (AR

930-35), which included an interview of Plaintiff and a physical examination.  Plaintiff told Dr.

Donaldson that he had had a "terrible year," that he only left his house occasionally to watch his

brother's new baby, and spent his days watching TV or playing video games (AR 931).  Dr.

Donaldson noted that Plaintiff was well-muscled and that the bulk was symmetric; there was no

muscle wasting; the left upper extremity had normal color, turgor, and temperature to touch;

there was no swelling or moist skin; there was hair on both arms; and Plaintiff reported sweating

normally on both arms (AR 931).  Dr. Donaldson also reviewed Plaintiff's medical records and

imaging studies from April 2014 through January 2015 (AR 932-34).

Dr. Donaldson opined that Plaintiff's "global loss of left upper extremity function is psychogenic" (AR 935).  He wrote:

> It is my opinion that [Plaintiff] does not have reflex sympathetic dystrophy or a brachial Plexopathy…. Given the maintenance of muscle bulk, I firmly believe that [Plaintiff] does indeed use his left upper extremity.  The maintenance of muscle bulk was also a diagnostic concern for Dr. Rios, his orthopedist.  It is my opinion that [Plaintiff's] apparent incapacity to use his left upper extremity is a manifestation of psychological distress.  Clearly [Plaintiff] is depressed…. *Whatever that psychological problem is, it is my opinion that it was not caused by lifting a case of Tide detergent.* [Plaintiff] needs a seasoned psychiatrist who I hope has the advantage of this report.

(AR 935) (emphasis in original).

On June 10, 2015, Plaintiff was referred to Jerrold Kaplan, M.D., for a commissioner's examination related to his worker's compensation claim (AR 671).  After examination, Dr. Kaplan wrote:

> No functional motion at the shoulder, elbow, or hand. Passively, I am able to gently stretch the fingers which are held as a fist.  There is severe spasticity throughout the left hand.  I can extend the fingers but they lack 25% of full extension.  Allodynia is present to light touch, vibration, and cold. Hyperpathia is present to pinwheel testing.  Digital temp testing is 1.5 to 2 degrees different in the left UE compared to the right.  Excessive sweating is noted in the left hand. The skin in the hand has a red-purple shiny appearance.  There is less hair on the forearm on the left than the right.  Back and [lower extremities within normal limits].  Muscle bulk currently compared to a picture on the phone does look like there has been significant loss of muscle mass throughout the bilateral upper extremities.  I am unable to detect a significant difference visually, left versus right muscle bulk.  Strength testing in the left UE is not possible [due] to pain.

(AR 670).  Dr. Kaplan stated that Plaintiff met the diagnostic criteria for CRPS and that he was concerned that Plaintiff had had "little treatment over the last year and ha[d] lost function of his left upper extremity, which has no functional motion.  He need[ed] to have immediate treatment or [he] risk[ed] permanent contractures."  Dr. Kaplan opined that Plaintiff had "sedentary work capacity but … no functional use of the left upper extremity.  There [were] no restrictions in terms of the lower extremities" (AR 670).

On March 24, 2016, Dean Mariano, D.O., saw Plaintiff for a worker's compensation injury/illness consult (AR 53-57, 764-68).  Dr. Mariano opined that Plaintiff had CRPS in his left upper extremity (AR 766).  He endorsed medication, IV ketamine, spinal cord stimulation, and physical therapy as reasonable treatment options, with physical therapy starting only after some of the symptoms of CRPS improved (AR 765-66).  Dr. Mariano noted that the skin temperature of the upper left extremity was decreased compared to the temperature of the upper right extremity.  There were identifiable signs of allodynia throughout the upper left extremity, as well as swelling in the area.  Dr. Mariano noted muscle atrophy throughout Plaintiff's body and that the records reflected that, prior to Plaintiff's shoulder injection, his pain was limited to the shoulder girdle and was aggravated with motion, with the CRPS symptoms developing after the injection (AR 767).

Dr. Chopra filled out three evaluations for Plaintiff over a one-year period.  An April 2016 physical capacities evaluation reflected Dr. Chopra's opinions that Plaintiff could sit or stand/walk for one hour in an eight-hour workday; could not perform simple grasping, repetitive motion tasks or fine manipulation with his left hand; and could not lift or carry at all during a work day (AR 741). The August 2016 evaluation described Plaintiff's impairment as "very severe" and characterized Plaintiff as fully disabled with a "very limited" residual functionality. Asked to list Plaintiff's functional limitations as to sitting, standing, walking, and lifting, Dr. Chopra wrote, "No Lifting" (AR 759).  In April 2017, Dr. Chopra completed a medical source statement (AR 903-06).  He reported that he had seen Plaintiff about every three months beginning in December 2015 (AR 903).  He opined that Plaintiff was unable to work and could not walk, sit, or stand for any length of time during a workday (AR 904-05).  He could not use

his left hand at all, and there were significant limitations on his ability to use his right hand (AR 905).

    D.    <u>Hearing Testimony and Function Reports</u>

Plaintiff and vocational expert ("VE") Erin Bailey testified at the June 23, 2017 hearing (AR 58-105).  Before the hearing, Plaintiff's counsel requested that the ALJ turn off the air conditioning because its use increased Plaintiff's pain (AR 61).  Plaintiff testified to his work history, including employment as a personal care assistant for Cerebral Palsy of Massachusetts in 2014 and 2015 after his injury.  Of that position, he said that his mother was doing the work for him because they were "trying to keep the job" (AR 69, 72).  When it became clear that Plaintiff was not getting better, he quit (AR 71).

On the topic of his physical condition, Plaintiff testified that he picked up a large case of detergent at work, felt a sharp pain in his left shoulder, and could not keep working (AR 75-76).  Thereafter, he consistently sought treatment, ranging from physical therapy to cortisone injections, but none of the interventions improved his condition (AR 77-78).  Dr. Chopra's pain medication prescriptions "slightly help[ed]."  He used a patch on the right side of his body because he was experiencing pain in his right knee and shoulder from overuse (AR 78-79).  Plaintiff had traveled to the Ukraine in the spring of 2015 because his mother wanted him to be seen by a doctor there (AR 79).  The plane ride was "really tough" and it was a "difficult flight" (AR 80).  Plaintiff told the ALJ that he had "never experienced this kind of pain in [his] life…. On a scale of one to 10, it's a constant 10," and he described the nature of the pain, stating that his left arm was sensitive to touch, wind, temperature, vibration, and sounds.  The arm frequently sweated and got hot; it changed color, looking very purple or red or pink; the skin got very shiny; and his muscles were very tense and tight (AR 89).  He had lost weight (AR 90-91).  His left

shoulder was frozen and he could not move it.  He held his left hand clenched in his lap at all

times and could not extend his fingers (AR 92-93).  He generally went shirtless because the

touch of fabric on any part of his left side was so painful.  He lay on his right side with his arm in

a certain position to watch television (AR 85).  His treatment plan had been dictated largely by

whether, or when, the worker's compensation carrier approved treatment (AR 86).

      In terms of activities of daily living, Plaintiff testified that his mother helped him with

dressing, self-care, and meals (AR 89-90).  He bathed once a week because it was "too painful a

process" (AR 90).  He only left the house for medical appointments and did not socialize with

anyone outside his family (AR 93-94).  He could only use a computer with his right hand and

only for a few hours (AR 91-92).

      The ALJ asked the VE to assume a hypothetical individual with Plaintiff's background

and characteristics who was capable of lifting and carrying twenty pounds occasionally and ten

pounds frequently; could sit, stand, and walk for up to six hours in an eight-hour day; could

occasionally stoop, crouch, kneel, balance, and climb ramps and stairs; could not crawl or climb

ladders, ropes, or scaffolds; could not tolerate exposure to extreme cold or vibration or hazards

such as dangerous moving machinery and unprotected heights; could not perform overhead

reaching with bilateral upper extremities; could not push or pull with the left upper extremity but

could perform "occasional reaching in other directions, handling and fingering, occasional

handling and occasional fingering with the left non-dominant upper extremity" (AR 98).  The

ALJ clarified that the hypothetical question contemplated "no overhead reaching with the

bilateral upper extremities, with occasional reaching in other directions, occasional handling and

fingering with the left non-dominant upper extremity" (AR 100).  The VE opined that such an

individual could not perform Plaintiff's past work, but could perform the work of a cashier,

ticket seller, or sorter, and that such jobs were available in the national economy (AR 99).  These

jobs could be performed by a person using his or her right hand for most activities (AR 100).  If

the person in question was only able to stand and walk for up to thirty minutes at one time, the

person would still be able to perform the jobs identified by the VE.  No employer would,

however, tolerate an employee being off task due to pain for three to four hours a day, or one

who was absent once a week (AR 99-100).

    E.    The ALJ's Decision

At the first step, the ALJ found that Plaintiff had engaged in substantial gainful activity

from the alleged onset date of April 3, 2014, through February 21, 2015, but not thereafter (AR

13).  At the second step, the ALJ found that Plaintiff had the severe impairment of left upper

extremity brachial plexus injury/complex regional pain syndrome (AR 14).  At step three, the

ALJ found that Plaintiff did not have an impairment or combination of impairments that met or

medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P,

Appendix 1, "with specific consideration given to Listing 12.04" (AR 16).

> Before proceeding to steps four and five, the ALJ found that Plaintiff had the RFC to
>
> perform light work as defined in 20 CFR 404.1567(b) except the claimant cannot
> perform overhead reaching with the bilateral upper extremities.  He can perform
> occasional reaching (in directions other than overhead), handling and fingering
> with the left nondominant upper extremity.  [Plaintiff] cannot push or pull with
> the left upper extremity.  [Plaintiff] can occasionally stoop, crouch, kneel, balance
> and climb ramps and stairs.  He cannot crawl or climb ladders, ropes or scaffolds
> with any measurable regularity. He cannot tolerate exposure to extreme cold,
> vibrations or hazards, such as dangerous moving machinery or unprotected
> heights.

(AR 16).  The ALJ further found that though Plaintiff's "medically determinable impairments

could reasonably be expected to cause the alleged symptoms," his "statements concerning the

intensity, persistence and limiting effects of these symptoms [were] not fully supported" (AR

17).

At step four, the ALJ determined that Plaintiff was unable to perform any past relevant

work (AR 22).  At step five, the ALJ concluded that Plaintiff was not disabled (*id.*).  Relying on

the testimony of the VE, the ALJ determined that Plaintiff could perform jobs found in

significant numbers in the national economy taking into account Plaintiff's age, education, work

experience, and RFC, and, therefore, Plaintiff was not disabled (AR 23).

IV.   ANALYSIS

Plaintiff contends that the Commissioner's decision should be reversed because the ALJ

failed to accord controlling weight to the opinions of Dr. Chopra who was an acceptable treating

source, and because the Appeals Council erred by refusing to address the significance of Dr.

Mariano's 2016 IME (Dkt. No. 17 at 1).  Because Dr. Mariano's 2016 IME was part of the

record before the ALJ, its significance is the degree to which it is consistent with Dr. Chopra's

opinions about Plaintiff's diagnosis and functional limitations.  Accordingly, the court addresses

Plaintiff's contentions in tandem.  The court concludes that the ALJ's rejection of Dr. Chopra's

opinions is not supported by substantial evidence.  Further, the record lacks substantial evidence

in the record to support the ALJ's finding in the RFC that Plaintiff could perform light work with

limited use of his left arm and hand.

The treating source rule of the Social Security Administration ("SSA") instructs:

the ALJ should give "more weight" to the opinions of treating physicians because
"these sources are likely to be the medical professionals most able to provide a
detailed, longitudinal picture of [a claimant's] medical impairment(s) and may
bring a unique perspective to the medical evidence that cannot be obtained from
the objective medical findings alone or from reports of individual examinations."

*Bourinot v. Colvin*, 95 F. Supp. 3d 161, 175 (D. Mass. 2015) (quoting 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)) (alteration in original). "A treating source's opinion on the nature and severity of a claimant's impairment(s) is entitled to controlling weight if it: (1) 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) 'is not inconsistent with the other substantial evidence in [the] case record.'" *Sanchez v. Berryhill*, No. 3:18-cv-30084-KAR, 2019 WL 2437265, at *6 (D. Mass. June 10, 2019) (citing 20 C.F.R. § 404.1527(c)(2)). "The regulations allow the ALJ to discount the weight given to a treating source opinion where it is inconsistent with other substantial evidence in the record, including treatment notes and evaluations by examining and non-examining physicians." *Bourinot*, 95 F. Supp. 3d at 175. "However, 'even when an ALJ does provide reasons for discounting a treating source opinion, remand is proper if those reasons are "unpersuasive" or "significantly flawed."'" *Lemieux v. Berryhill*, 323 F. Supp. 3d 224, 229 (D. Mass. 2018) (quoting *Santana v. Colvin*, No. 15-cv-13232-IT, 2016 WL 7428223, at *3 (D. Mass. Dec. 23, 2016)).

When, as in this case, an ALJ does not accord controlling weight to a treating source opinion, the ALJ must "explain the weight given to a treating source opinion and the reasons supporting that decision." *Bourinot*, 95 F. Supp. 3d at 176 (citing 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)). In evaluating a treating source opinion, the ALJ considers the following factors:

> 1) length of treatment relationship and frequency of examination; 2) nature and extent of the treatment relationship; 3) how well supported the conclusion is by relevant evidence; 4) how consistent the opinion is with the record as a whole; 5) how specialized the knowledge is of the treating physician; and 6) other factors that may be relevant. The ALJ abuses his discretion when he "ignore(s) medical evidence or substitute(s) his own views for uncontroverted medical opinion."

*Abubakar v. Astrue*, No. 1:11-cv-10456-DJC, 2012 WL 957623, at *9 (D. Mass. Mar. 21, 2012) (quoting 20 C.F.R. § 404.1527(d)(2)-(d)(6); *Nguyen,* 172 F.3d at 35).

Dr. Chopra – and most of the medical care providers who examined him – diagnosed

Plaintiff with severe CRPS.  Dr. Chopra opined that the condition was so severe that Plaintiff

was unable to work.  In SSR 03-2p, the SSA described CRPS as "a chronic pain syndrome most

often resulting from trauma to a single extremity. …  It is characteristic of this syndrome that the

degree of pain reported is out of proportion to the severity of the injury sustained by the

individual."  SSR 03-2p, 2003 WL 22399117, at *1.  The SSA acknowledges in SSR 03-2p that

> [p]rogression of [CRPS] is marked by worsening of a previously identified
> finding ….  Efficacy of treatment must be judged on the basis of the treatment's
> effect on the pain and whether or not progressive changes continue in the tissues
> of the affected region. … Persistent clinical progression resulting in muscle
> atrophy and contractures, or progression of complaints of pain to include other
> extremities or regions, in spite of appropriate diagnosis and treatment, hallmark a
> poor prognosis.

*Id.* at *2.  Adjudicators are reminded of certain principles in connection with the evaluation of a

disability claim based on CRPS that are relevant here.  First,

> conflicting evidence in the medical record is not unusual in cases of [CRPS] due
> to the transitory nature of its objective findings and the complicated diagnostic
> process involved.  Clarification of any such conflicts in the medical evidence
> should be sought first from the individual's treating or other sources.  Clinical
> progression does not necessarily correlate with specific timeframes.

*Id.* at 5.  Second, "[c]hronic pain and many of the medications prescribed to treat it may affect an

individual's ability to maintain attention and concentration, as well as adversely affect his or her

cognition, mood, and behavior."  *Id.*  Third,

> [o]pinions from an individual's medical sources, especially treating sources,
> concerning the effect(s) of … CRPS on the individual's ability to function in a
> sustained manner in performing work activities, or in performing activities of
> daily living, are important in enabling adjudicators to draw conclusions about the
> severity of the impairment(s) and the individual's RFC.

*Id.* at *7.

The ALJ rejected Dr. Chopra's opinions about Plaintiff's functional limitations on the basis that there was "a substantial difference of medical opinion" about whether Plaintiff's "reported limitations to the left upper extremity and his alleged chronic pain [were] consistent with his activities of daily living, efforts to relieve his pain, clinical examinations and vocational history" (AR 21).  She relied instead on the opinion of Dr. Donaldson, to which she gave "great weight," and Dr. Rios, who, she said, "questioned [Plaintiff's] allegations and made different medical findings on examination" (AR 22).  "Based on the record before this court, … these are not legitimate reasons for rejecting Dr. [Chopra's] opinion." *Lamb v. Barnhart*, 85 F. App'x 52, 56 (10th Cir. 2003) (unpublished) (reversing the district court's affirmance of the ALJ's denial of benefits in a CRPS case and directing that the case be remanded to the Commissioner for further proceedings).

To begin with, having concluded that Plaintiff had CRPS and that it was a severe impairment, the ALJ erred by giving "great weight" to the opinion of Dr. Donaldson, who is the only medical care provider who evaluated or treated Plaintiff and concluded unequivocally that Plaintiff did *not* suffer from CRPS (AR 22, 931-35).  SSR 03-2p explains that "a claimant who experiences this condition will often not have the sort of objective clinical findings that would normally be expected to produce the amount of pain the individual is reporting." *Mark L. v. Saul*, Case No. 3:18-cv-338 JD, 2019 WL 2560099, at *3 (N.D. Ind. June 21, 2019).  Dr. Rios, an orthopedist who first saw Plaintiff some six weeks after the initial injury, and, so far as appears from the record, last saw him in October 2014, twice referred Plaintiff for consultation for possible CRPS because his pain symptoms appeared inconsistent with a possible orthopedic diagnosis (AR 535).  SSR 03-2p further explains that "[p]rogression of the clinical disorder is marked by worsening of a previously identified finding, or the manifestation of additional

abnormal changes in the skin, nails, muscles, joints, ligaments, and bones of the affected region."

SSR 03-2p, 2003 WL 223991217, at *2.  Although purporting to analyze this case in accordance

with SSR 03-2p, the ALJ failed to consider that the record, read as a whole, confirmed that

Plaintiff's CRPS progressed significantly over the period of time covered by the administrative

record.  The ALJ's reference to purported inconsistencies between the views of Dr. Chopra and

those of other medical care providers who treated Plaintiff early on ignores this progression.

Indeed, when the record is viewed longitudinally, it is notable for its consistencies rather

than its inconsistencies.  *Cf. Ciraulo v. Colvin*, C.A. No. 16-cv-30181-MAP, 2018 WL 1316206,

at *10 (noting that to avoid the impact of the treating care provider's conclusions, the ALJ had

"cherry pick[ed]" the record).  Dr. Kaplan referred Plaintiff to Dr. Chopra in November 2015 for

possible ketamine infusion after other interventions – two courses of physical therapy (AR 596-

618, 831-58), cortisone injections (AR 537, 535), non-opiate pain medications (569, 621), and a

left stellate ganglion block (AR 628) – failed to improve Plaintiff's condition (AR 776).[7]  At Dr.

Chopra's initial evaluation of Plaintiff on December 18, 2015, he reviewed Plaintiff's CRPS

treatment history, gave him a physical examination, and developed a treatment plan (AR 747-

53).  When Plaintiff saw Dr. Kaplan a month later, the doctor endorsed Dr. Chopra's plan (AR

775).  Dr. Mariano, who performed a second IME in March 2016, concurred with the CRPS

diagnosis and with Dr. Chopra's treatment recommendation (AR 766-67).  Thereafter, Plaintiff

returned to Dr. Chopra ten times over the following year: April 22 (AR 799-800), May 26 (AR

797-98), July 25, 26, and 28 (AR 791-96), August 1, 2, and 3 (AR 789-91), September 16, 2016

---

[7] There is no evidence in the record to support the ALJ's assertion that "Dr. Chopra is the provider the claimant has chosen to see" (AR 22).  This inaccurate statement carries the implication, unsupported by evidence in the record, that Dr. Chopra, whose specialty was pain management and who worked in an academic setting, was not impartial in his evaluation of Plaintiff.

(AR 786-87), and April 10, 2017 (AR 900-01).  Dr. Chopra's records of each of these visits

reflect Plaintiff's severe pain, inability or refusal to use his left upper extremity because of pain,

and autonomic instability.  These are symptoms characteristic of CRPS.  *See* SSR 03-2p, 2003

WL 22399117, at *2.

Aside from Dr. Donaldson, the records of care providers who saw Plaintiff after the

October 3, 2014 joint injection noted symptoms consistent with CRPS.  When Dr. Rios saw

Plaintiff on October 14, 2014, he noted tenderness to light touch over the majority of his upper

extremity and recommended a second consult for CRPS (AR 535-36).  On February 16, 2015,

Dr. Lantner was unable to assess Plaintiff's upper left extremity because of Plaintiff's pain.  Dr.

Lantner noted that the upper left extremity was warm to the touch and that his left shoulder and

upper extremity pain was likely secondary to CRPS (AR 554).  On April 29, 2015, Dr. Malik

diagnosed Plaintiff with CRPS, noting several differences between Plaintiff's upper left and right

extremities, with the upper left extremity exhibiting swelling, sweating, color change, a weaker

peripheral pulse, poor capillary refill in the left hand, and allodynia (AR 560).  On May 5, 2015,

Dr. Hellman noted intense allodynia in response to palpation of Plaintiff's left upper extremity

(AR 568).  On May 23, 2015, a physical therapist concluded that Plaintiff was not a candidate for

physical therapy because he could not tolerate any touch or movement of his upper left extremity

(AR 579).  On May 26, 2015, a nurse practitioner who evaluated Plaintiff noted that his left arm

was weaker, cooler, exhibited hair loss, and showed mottled skin (AR 584).  On June 10, August

12 and October 5, 2015, Plaintiff saw Dr. Kaplan, who agreed with a diagnosis of severe CRPS,

and noted that Plaintiff's left upper extremity exhibited severe allodynia, decreased motion,

spasticity, and no functional use.  He further noted a temperature difference between Plaintiff's

left and right hands, and that the skin on the left hand was red, shiny, and swollen (AR 666-67,

670).  On examination at an August 25, 2015 visit to the Hartford Hospital Pain Treatment

Center, Alexandra Ozmian, M.D., noted symptoms of CRPS in Plaintiff's upper left extremity.

Plaintiff's upper left extremity reflexes were abnormal, as were his peripheral neuro

examination, skin, and subcutaneous tissue in this area (AR 622).  Physical therapy in July and

August 2015 was ineffective (AR 616).  The ALJ's finding that Dr. Chopra was the only care

provider who reported significant abnormalities in skin color, texture, and temperature in

Plaintiff's upper left extremity is plainly wrong (AR 18).  Thus, the record does not contain

substantial evidence to support the ALJ's finding of substantial medical differences of opinion

about the nature and severity of Plaintiff's CRPS or about functional limitations attributable to

his condition.  *See Lemieux*, 323 F. Supp. 3d at 229 (stating that the ALJ was not free to discount

treating source opinions based on "conflicting evidence" where there was no real variability in

providers' assessments).

Nor was the record of Plaintiff's activities of daily living or efforts to relieve his pain

inconsistent with Dr. Chopra's opinions.  As to the latter point, the extensive record that was

before the ALJ demonstrates that Plaintiff diligently sought treatment for severe pain.  To the

extent there were delays in following a particular treatment recommendation, the ALJ apparently

failed to recognize that the record showed that, because Plaintiff's condition started with an

injury at work, many aspects of Plaintiff's care were dictated by decisions and delay attributable

to his employer's workers' compensation carrier (AR 86, 553, 555, 668, 671, 673-74, 742).

Plainly, this is not a case in which Plaintiff failed to seek treatment for the pain he claims was

disabling.  *See Johnson v. Astrue*, 597 F.3d 409, 413 (1st Cir. 2009) (citing *Nguyen*, 172 F.3d at

36).  Moreover, none of the individuals who provided treatment to Plaintiff suggested that

Plaintiff was malingering or that he was not experiencing the pain he described.  *See id.* at 414

("[T]he Commissioner points to no instances in which any of claimant's physicians [or other care providers] ever discredited [his] complaints of … pain.").

As to Plaintiff's activities of daily living, the ALJ relied primarily on the information that Plaintiff told Dr. Donaldson in March of 2015 that he played video games and occasionally babysat for his brother's child, watched television all day, traveled to the Ukraine with his mother in the spring of 2015, and had a personal care attendant job in 2015 after his initial injury (AR 17). Plaintiff testified that, by the time of the hearing, he only left the house for medical appointments; his mother did all of the shopping and cooking and helped him to care for himself, including helping him bathe; and he spent most of his time on the sofa watching the television in a position that diminished his pain. He did not wear shirts and tried to minimize his motion (AR 85). He told the ALJ that he took the personal care attendant position in 2014 and retained it through 2015 hoping that his medical condition would improve, that his condition did not improve, and that his mother actually did the work (AR 71). He accompanied his mother to her native country of Ukraine in 2015 because she hoped a doctor there could help him with his pain. The flight was difficult (AR 80, 84). There is no evidence of Plaintiff "traveling," other than the single trip to Ukraine for which Plaintiff provided a plausible explanation.

The ALJ did not ask Plaintiff about his activities of daily living at the hearing, and the record does not appear to contain statements about Plaintiff's activities from neighbors, friends, relatives or clergy, or other sources knowledgeable about Plaintiff's ability to function in daily activities. *See* SSR 03-2p, 2003 WL 22399117, at *7. As was his account at the hearing, Plaintiff's 2016 account to the SSA about his ability to function in daily activities was consistent with Dr. Chopra's assessments (e.g., AR 345-352, 378-388, 399). The single reference in Dr. Donaldson's March 2015 IME about Plaintiff report that he played video games does not

constitute substantial evidence about Plaintiff's activities of daily living contradicting Dr.

Chopra's assessments in 2016 and 2017.  *See Bazile v. Apfel*, 113 F. Supp. 2d 181, 188 (D. Mass.

2000) (concluding that the ALJ committed legal error by failing to give due consideration to the

claimant's testimony as part of determining her RFC because there was no other evidence in the

record regarding her activities of daily living).  Finally, there is no dispute in the record that

Plaintiff retains the use of his lower extremities and, for the most part, of his upper right

extremity.  The limitations assessed in Dr. Chopra's medical source statement are most fairly

read as an expression of his view that Plaintiff was unable to perform any function in a

workplace, whether it be sitting, standing, or lifting, because of the severity of his CRPS (AR

903-06).

While an ALJ has the responsibility to make credibility judgments, "an ALJ may not

'disregard [a treating physician's] medical opinion based solely on [the ALJ's] own amorphous

impressions, gleaned from the record and from … evaluation of [a claimant's] credibility.'"

*Tucker v. Colvin*, 117 F. Supp. 3d 594, 609 (D. Del. 2015) (quoting *Morales v. Apfel*, 225 F.3d

310, 318 (3d Cir. 2000)) (alterations in original) (finding that the ALJ's decision to grant the

treating physicians' opinions little weight in a CRPS case was not supported by substantial

evidence where the ALJ's rejection of those opinions appeared to be based only on her

assessment of the claimant's credibility).  For the foregoing reasons, the court finds that the

ALJ's rejection of Dr. Chopra's opinions about the extent of Plaintiff's functional limitations

was not supported by substantial evidence and was not in accord with the principles set forth in

SSR 3-2p.

In addition, the record lacks substantial evidence to support the RFC fashioned by the

ALJ, which included the finding that Plaintiff could "occasional[ly] reach[] (in directions other

than overhead), handl[e] and finger[] with the left nondominant upper extremity" (AR 22). The

care providers who treated Plaintiff uniformly noted by sometime in 2015 that he had no

functional use of his left upper extremity and could not reach with his left arm or open or use his

left hand. There was no functional assessment from any qualified source contradicting the

consistent reports by care providers of this functional limitation. The ALJ was not free to

construct an RFC based on her own lay person's interpretation of the medical record. *See, e.g.,*

*Mariani v. Colvin*, 567 F. App'x 8, 10 (2d Cir. 2014) (remanding the case where the ALJ

rejected the treating physician's conclusion that the claimant could not use his hand and decided

that he could use his hand 50% of the time although there was no substantial evidence in the

record for this "alternative conclusion"). "[S]ince bare medical findings are unintelligible to a

lay person in terms of residual functional capacity, the ALJ is not qualified to assess residual

functional capacity based on a bare medical record." *Gordils v. Sec'y of Health & Human Svcs.*,

921 F.2d 327, 329 (1st Cir. 1990) (per curiam); *see also Manso-Pizarro v. Sec'y of Health &*

*Human Servs.*, 76 F.3d 15, 17 (1st Cir. 1996); *Oliveras v. Comm'r of Soc. Sec.*, 354 F. Supp. 3d

84, 91 (D. Mass. 2019) (reversing and remanding the Commissioner's decision where "[t]he

balance of the RFC assessment … [was] not tethered to any medical opinions in the record that

the ALJ did not reject"); *Mason v. Berryhill*, 245 F. Supp. 3d 327, 332 (D. Mass. 2017).

Considering the complexity of Plaintiff's condition, this is a case in which "[t]he hearing officer

was not properly qualified to make this determination about [Plaintiff's] RFC without the aid of

an expert." *Beyene*, 739 F. Supp. 2d at 84 (citing *Roberts v. Barnhart*, 67 F. App'x 621, 622,

623 (1st Cir. 2003) (per curium); *Rivera-Figueroa v. Sec'y of Health & Human Servs.*, 858 F.2d

48, 52 (1st Cir. 1988); *Sanabria v. Astrue*, Civil Action No. 06cv11380-NG, 2008 WL 2704819,

at *5 (D. Mass. July 9, 2008)).

V.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Order Reversing the Commissioner's Decision (Dkt. No. 16) is GRANTED.  The Defendant's Motion for an Order Affirming the Decision of the Commissioner (Dkt. No. 21) is DENIED.  The case is remanded to the Commissioner for further proceedings.  "On remand, the ALJ must reassess, after any proceedings that may be suitable, the severity of claimant's symptoms, including his pain … , taking into account the entire record and obtaining any expert medical opinion needed to [further] illuminate the medical records."  *Nguyen*, 172 F.3d at 36.  The Clerk's Office is directed to close the case on this court's docket.

It is so ordered.

Dated: July 19, 2019                          /s/ Katherine A. Robertson
                                              KATHERINE A. ROBERTSON
                                              United States Magistrate Judge